Marshall and Thurman v. Woodward. Mr. Schneck. May it please the Court, my name is Steve Schneck and I represent the appellants Debbie Marshall and Peggy Thurman. The United States depends on its military contractors to follow their quality systems and to tell the truth. In this case, Woodward submitted false certificates of conformance and lied to a government agent on the most important issue, Woodward's failure to inspect the Grade A joint. I'd like to start with Woodward's lies to government agent Harrison Dysart. Agent Dysart met with Marshall and Thurman on April 29, 2005. Based on that meeting, Mr. Dysart wanted to find out if Woodward was X-ray inspecting the Grade A joint on a regular basis. Before agent Dysart started his review, Woodward figured out that Marshall and Thurman had spoken with the government. At that time, the person in charge of Woodward's quality department was Spitamon Tata. Mr. Tata knew that Woodward does not X-ray inspect the Grade A joint on a regular basis. But on July 6, 2005, Mr. Tata spoke with agent Dysart at Woodward's facility and told agent Dysart that Marshall and Thurman were wrong on the inspection issue because Woodward was X-ray inspecting the Grade A joint on a regular basis. That was a lie. Forgive me. And you help me if I'm wrong. It seems to me that the plaintiffs did not identify a single Woodward decision maker who thought that Woodward was making false statements to the government. And I think that it's absolutely undisputed that a compliance committee at Woodward asked for a professional engineering analysis that was honest and forthright and to let the chips fall where they may. We did identify a decision maker. The decision maker was Steve Krugler. And what Your Honor is talking about is a BCOC investigation after the fact. The false certification issue. Yes. Can I talk about Steve Krugler and Woodward's knowledge? Because he is the decision maker that we did identify. The district court assumed that Woodward violated its inspection requirements and submitted false certificates of conformance. Those assumptions are fully supported by the evidence. For example, Woodward has a documented quality system with specific requirements. One fundamental requirement is that every joint has to be inspected. And if a joint does not pass inspection, it must be scrapped or reworked. The cost, that costs Woodward money and time. Jeff Diestelmeier worked for Woodward for 18 years, including five years as manager of quality assurance. Mr. Diestelmeier signed and approved Woodward's quality assurance manual. And he also led a special project that revised SP 865, which sets forth Woodward's quality inspection requirements. Diestelmeier provided unambiguous admissible testimony that Woodward knows what its quality requirements are. And that Woodward knowingly violated the inspection requirements for the grade A joint. Now let me talk about Steve Krugler. The district court misconstrued the evidence about Steve Krugler. Mr. Krugler was Woodward's production engineer. In October 1996, Mr. Krugler approved the design of the grade A joint with an x-ray inspection. In December 1996, three months later, Krugler approved the design for a similar joint that also had an x-ray inspection. The documentation in December 1996 that was written and approved by project engineer Krugler, a decision maker, said that the proper procedure for these kinds of joints is to x-ray inspect. One month later, in January 1997, Krugler deleted the x-ray inspection for the grade A joint without providing a substitute inspection. This is the most critical joint on the subassembly, and Mr. Krugler knew that a compliant substitute inspection was necessary. All right, help me with this then. Sure. Why is it a material fact whether the grade A joint has one exposed edge or two? Wasn't it established that even if Woodward was not properly examining the grade A joint edges, the government knew that they were not, did a thorough investigation, and concluded that they're satisfied with the product from Woodward in any event? So what I don't understand is what would the difference have been? The difference would have been exactly on that inspection issue, Your Honor, and it's because Woodward lied to Agent Dysart on the inspection issue. In November 2005, Agent Dysart wrote his conclusions in a one-paragraph email. The most important statement and the sole factual conclusion in Dysart's email was the following. He wrote, quote, the specific claim that the sensor was supposed to be x-rayed but hadn't been, was found to be false based on review of the x-ray records for that part. This sentence was Dysart's only specific finding about Woodward's violations, and he was wrong. Woodward does not x-ray inspect the grade A joint on a regular basis. Woodward lied to Mr. Dysart, and he was deceived. This is a crucial fact because the district court relied so heavily on Agent Dysart's email conclusion. You can't give any credit to his conclusion because Woodward's lies completely undermined it. Is everyone x-rayed every, is this occasional or is this where every product, joint produced? This product has several joints, and what we're talking about is the most critical. It's the only one that's been designated as a grade A, the highest designation. All of the other joints are x-ray inspected, so far as we know. The evidence shows this one is not, and Mr. Krugler knew that you had to inspect both exposed edges of this joint, and when he initially approved a drawing for this joint, it had an x-ray inspection. Then he deleted it, and when he deleted it, he didn't provide a substitute compliant inspection, and he just allowed the joint to pass without inspection. He knew that was wrong. You have to inspect this joint. The certificates of conformance that Woodward submits with every invoice when it delivers parts to the government certify that the parts meet Woodward's quality requirements. Those quality requirements include a requirement that every joint, the grade A, the grade B, the grade C, even the grade D, has to be inspected. Here's the grade A, the only grade A joint on this product, and it's not inspected in compliance with their own requirements. So is this a procedural challenge as opposed to one that there was a defective part? It's a defective part by not being inspected. You've got to inspect the part. Now, is the part out there? I mean, there's thousands of them, but every part that gets sent down the line because this most critical joint on the subassembly of the part is not inspected, the whole part is deficient. It's defective. It's not inspected, and it's being passed off to the government as being compliant when it's not. Let me ask you this. What made Marshall and Thurman think that they'd been fired on April 18th, 2015? Their supervisor, Mark Maitre, told them, you're fired. He escorted them to their work area, had them retrieve their belongings, and escorted them out of the office, out of the facility. Does the fact that they were sent a letter on May 4th asking for their resignation undercut their belief that they were fired on April 18th? I don't think so. They testified, not only were they told that they were fired by their supervisor who had the power to hire and fire them, but that very same day Mrs. Marshall left a message on Woodward's hotline, it's exhibit 125 in the record, which she said that both she and Mrs. Thurman were terminated. In addition, two days later, she sent a letter by fax to her then senator saying that she had also been terminated. How about the fact that they continued to be paid? That was their choice. I believe what really happened is they got quickly into litigation mode as soon as she left the message that she had been fired and once again said that they're in violation of their own requirements. The message on the hotline, just like emails before to her supervisor and others said, you're violating SP 865. Employees at this company refer to SP 865 as the Bible. They know they cannot violate it and Mrs. Marshall had been there for over 18 years. She knew what she was doing. She was a trusted employee. She investigated leaking sensors, leak sensors that had been leaking for months that had been sitting around and nobody had investigated. She volunteered to investigate them, found that they're leaking, sent things up the chain and was instead told to push production and they did not correct the violations. Nobody said to her or Mrs. Thurman, you know you're right, we are inspecting this joint. They never said that. They are not inspecting this joint and certifying that they are. Do you suppose that they would have been terminated if they'd reported their concerns to the government but hadn't refused to continue to do their jobs? It's possible if Woodward found out that they might have. What happened though is also, and I didn't say this although it's in our briefs, is that Mrs. Marshall told Mr. Maitrey, the supervisor, that she was going to tell the government that Woodward was violating its requirements. She was going to tell them. That was part and parcel of all the information Supervisor Maitrey knew when he decided that these two long-term employees are no longer totally tied in with the company and he fired them. This wasn't some, you know, long-term delay in what happened between and her and Mrs. Marshall's investigation then being fired. They were fired 12 days after the investigation. Six days after she told, excuse me, four, six days I believe after she told them that she was going to go to the government. Were these joints that were not x-rayed, were they the ones she claimed were leaking? Yes. She did an investigation. She was given parts that were leaking, were already found to be leaking. She wasn't the first one to find that they were leaking. They've been collected since December of 2004. She's given two of those parts on April 6th and six more on April 7th. She investigated all eight in something called a solvent tank. She found that seven of the eight were leaking at the grade A joint. So these parts were leaking at that joint and that joint had not been x-ray inspected or inspected per Woodward's own requirements. So she also, on the first day of her investigation on April 6th, she went to a senior x-ray technician, Mark Frutig. She brought him one of the two parts that she looked at on April 6th and said, can you x-ray this part? And he told her, this part's not x-rayed and she didn't know that. That was a shock to her. So far as she understood, all joints would be x-rayed and this one was not. Is there some indication after x-ray that you can tell it's been x-rayed? Sure. And there's a record of an x-ray, just like when... Well, I mean, it's written down. So you can't look at the product and see that it's... No, you can't look at the product itself, but there's paperwork that trails the product that shows whether it's been x-rayed or not. They keep detailed records of that for each part, every joint. Does this part, does each helicopter have just this one part? I mean, the one in dispute? Each helicopter has two engines. Each engine has one of these parts. Okay, so it's two per helicopter? That's right. Okay, because I'm trying to look at the volume. The volume, so far as... Yeah, what? As I understand, is that there's approximately 6,000 of these helicopters in the field right now. And during the period it's in our brief, I can give you the exact numbers. From 1996 through 2013, Woodward shipped 5,154 fuel controls directly to GE. And in that same period of time, Woodward shipped more spare parts to the United States directly. Woodward shipped 6,571 fuel controls, 117 sensors, and 1,058 sensor bulb assemblies, all of which are subparts of the unit that they give to GE directly to install on the engine. And then I'm just trying to figure out the routine of inspection and how many, how fast these go through. This isn't an assembly line where 10 come off per hour or something, or maybe 20. I don't understand the whole manufacturing process. I don't know that there's evidence of how many come off the assembly line like that. Because, you know, this is one of the problems, this thing goes back to whatever, you know, we've got this space of time here, which is pretty long. And so you distribute, they produce, you say it could be 6,000, and over however many years that is. I'm just wondering how many they produce a day, or is this just a special line that they do only on demand, or what? I don't know that there's... Maybe we don't need to know this, but it is perplexing, especially when you have the three inspectors that come in at the end and say the product's okay. Which inspectors do you mean? Well, the DOD, the... The DOD. Well, okay, so Agent Dysart, though, is the one who's lied to. He's lied to on the inspection issue, and his conclusion is wrong. He has a one-sentence conclusion in his email on the inspection issue, which is dead wrong, because Woodward lied to him on that issue. If Woodward didn't think that it was important to inspect this joint, why would the then head of its quality department lie to Agent Dysart about the inspection issue? And why would he isolate this as the specific claim in his one-paragraph conclusion? The inspection issue, in our judgment, is the most important issue of all. There's... They're making a part, and the most critical joint is not inspected. You can look at field history and say, wow, maybe we're lucky, but it just takes one failure, and this is a critical joint. It's also... These parts are specifically designated under the military contracts that they're sold under as what are called flight safety parts, and by definition, under the United States military standard, that means it's a part that if it fails, it can result in death to the occupants of the aircraft. This company also trains its employees. I'm sorry, I'm into my... You may finish your thought. It trains its employees with a video of an emergency landing, telling them these quality requirements are essential to protect the lives of American soldiers. Mrs. Marshall and Mrs. Thurman were put in the untenable position of allowing parts to pass that had not been inspected, that had not been in compliance with Woodward's own requirements that they had been trained must be followed. Thank you, Mr. Stein. Thank you, Judge. Thank you. May it please the court. The Seventh Circuit has made abundantly clear in Luckey versus Baxter, in Lammers versus City of Green Bay, and a variety of other cases that disagreements over technical requirements in government contracts do not constitute fraud. Yet here, plaintiffs repeatedly focus on their competing and idiosyncratic interpretations of Woodward's engineering and manufacturing processes. Those idiosyncratic and competing interpretations do not constitute a claim of fraud. Now, I should say first that Woodward and others strongly believe that its manufacturing processes fully comply with its contractual obligations. This is not Woodward standing alone. But the correctness of that belief doesn't matter for purposes of this appeal. And the correctness of that belief that they're doing things as required doesn't matter because, as the district court noted, there simply is no credible evidence of knowledge of any false representations. There's simply none in the record. There's no way a reasonable jury could conclude that Woodward believes or suspects that they're making a false statement by not making these parts the way the two plaintiffs claim they should be making them, and that by certifying that the parts are in the quantity and quality called for and in accordance with applicable specifications. Are you saying that no factual determination as to whether Woodward was telling the truth to the government is possible, that it could not be a factual issue for a jury to decide? I mean, the plaintiffs seem to insist that you were lying and you seem to say that you were completely truthful. So saying one is lying, Your Honor, is insufficient as a matter of law to overcome a motion for summary judgment. Saying it, and if I might... Why wouldn't that be a factual issue for a jury to decide? Because one is not permitted simply to speculate. You actually have to point to real evidence, and this is what the district court said. What do we have by way of evidence that Woodward even doubts its beliefs, even doubts its belief? So what did the plaintiffs point to? Well, they speculated, frankly, that false statements were made. Couldn't point to any evidence. They referenced their expert. Their expert speculates, quote, well, they should have known. They should have known, which is from someone without firsthand knowledge, by definition, who speculates they should have known. At most, maybe it's a suggestion of negligence, wrong standard in a fraud case. What do they turn to next? Well, they say, Woodward should have known because that these were false statements, because we told Woodward they were false. So the two operators are saying the evidence of falsity, knowledge of falsity, is we told Woodward. That's simply their view. That's not, as the district court noted, evidence. What do they turn to next? A rather idiosyncratic and strained interpretation of this procedure, of this process, that everyone for years, from Woodward's engineers and materials experts, to General Electric, the general contractor, who is intimately involved in this entire process, to the Department of the Defense Contract Management Agency, who have examined this from beginning to end. They all say, there's a plain reading of these requirements. There's this other strained, idiosyncratic reading. The district court said, that can't, you can't infer knowledge from that sort of evidence. If there was an obvious, if you were saying two means three, or white means black, and trying to maintain that you were innocent, perhaps there could be an inference of knowledge. But with these pieces of evidence, finally, the district court noted that the plaintiff said, you could have an auditorium full of engineers tell us we are wrong, that you're not misrepresenting, and we still would not believe them. That, again, is just a strong opinion. It's not evidence of knowledge, Your Honor. So, why is it not enough to get to a jury? Because, as the courts held over and over again, it's not sufficient in the context of summary judgment. On the other side of the coin, what evidence of the genuineness of their belief did Woodward present? Well, their project, or their project engineer, Heather Dietrich, she did her study. The materials engineer, Barbara Swanson, she did her study. Steve Gorman, a senior engineer, that's the first round of studies. Then, they're reading the document, the one that says what you should do, in a way that the responsible people in the company, and that everyone outside the company has said, makes sense. It's not a crazy reading. So, there's nothing to suggest there that there is a hidden disbelief, or said the other way, knowledge that they're lying. No one from General Electric, or the government, suggests otherwise. And this notion that the government was somehow not fully informed is kindly a distraction. The drawing itself, the engineering drawing, shows the tests that are required on this part. The engineering drawing, once it's finalized, cannot be modified without the approval of General Electric, and indirectly, the government. You can read the drawing. Every test must be listed. What are the tests that are listed? Visual inspection under magnification. So, that's one, it's referenced. These are reference numbers. You go to the manual, and it says that means you must visually inspect under magnification. A spectrometer test must be done. So, this is a leak test that must be done. Those are the tests that are listed on the drawing. People in the business know when you read that drawing, and you see those are the tests, those are the tests. No one's fooled. Dysart, when he did his investigation, it lasted some, from call it May to November, he describes his investigation as follows. I looked at the engineering drawings. I talked to the engineers. I watched the process. So, he watched these parts being made. So, he saw there was no X-ray of this particular joint, and there's a host of reasons why there is no X-ray. It's not necessary at this particular joint. Other tests are done, and I should mention this, Your Honor. This part is at the early stages of becoming a larger assembly. It's tested twice at this very early stage, and these parts are in relatively small numbers. A handful a day are produced. These are expensive, complicated assemblies, ultimately. That subassembly is tested eight times further along the process until there's a final acceptance test. These parts are tested, and the district court talked about this, over and over and over again. General Electric tests them when they get the part before it's put on the jet engine. The DCMA, so the Defense Contract Management Agency, has a group of people as well at General Electric. They were consulted when this issue arose. So not only was Dysart involved, his counterpart, Kraft, in Connecticut, at General Electric became involved. Ultimately, the contracting officer, who's responsible on the government side for administering this contract, she was advised as to the result of Dysart and Kraft's work. She has to continue today to certify that the parts are compliant. So it's not just Woodward saying the parts are compliant. Today, when one of these shipments goes, the government will stamp their agreement that the parts are compliant. And then, and only then, will the government pay Woodward. So you can't get past knowledge. Now, in terms of materiality, and Your Honor mentioned this, we have a situation in a circuit where we have said, when the government knows everything there is to know and they continue to deal with you, you can't satisfy the materiality requirement under the False Claims Act. Here, the government is the partner of Woodward. They are with them from the beginning to the end of this. They continue to buy the parts, made precisely the same way, same inspections. Now, I should say, the question about the parts becoming, according to the plaintiffs, not being made correctly, was raised by them in April, a month after their work on a different part of this assembly was criticized. When they were accused of doing their steps, which come later than the steps we're talking about here, when they were criticized for doing their work, they said, the people doing the steps before us, the joint we're talking about, are making a mistake. That's how this whole discussion started. So I think it's important to have this in context. Was that subsequent defect detected? There was some problem after when it reached their point in what I'll call an assembly line? No, Your Honor. There was no problem. They would call them step two in the process. When their work at step two was criticized, they raised the question, you're doing step one incorrectly, and thank goodness you have us for pointing that out. I understand that, but was there a problem at step two? Yes, and that was corrected. Yes. You know, Dysart's report seemed to indicate that he believed that Woodward was, in fact, X-raying the parts. Was Woodward doing so? Here's the context of that, Your Honor. This part is not X-rayed because the X-ray is ineffective. It's too dense. So when the issue was raised, they cut up some of these parts and attempted to X-ray them, and they also attempted to X-ray, not cut up, to see could you get a picture? And Dysart was made aware of the attempts during the investigation to do an X-ray. But he communicated with Kraft even before this, and he said, the part is not being X-rayed. And as I said, the drawing shows it's not X-rayed. So he's confusing in that sentence, or at least he's not clear about whether, it's not X-rayed in production. They attempted during the investigation to do some X-rays. The important thing is, though, Dysart testified unequivocally in his deposition, I may have not been artful about how I described that, but I know your theories now. Now, he's saying this in front of DCMA lawyers when he's being examined. Not Department of Justice lawyers, but the lawyers that represent this agency. He said, I was not as clear as I should have been. I know the part's not X-rayed during production. I'm fully aware of that. That's his unequivocal testimony. And he's doing this with counsel present. And he also testified, he observed the entire process. You cannot know, you cannot be confused about this. He was confused because Tata said to him, we did some X-rays, but it was part of an investigation, not part of the process, the normal process. I wanted to mention on the retaliation issue. So again, the court has said it multiple times that the False Claims Act and Illinois common law protects employees from being discharged for a defined kind of protected activity for blowing the whistle about fraud. It doesn't provide protection for those who once they raise a question and they're fully and it's fully vetted and it's investigated and they're told to go back to work and they say, no, we are right and you are wrong. And there's a series of cases. I believe it's in it's in the Lucky Baxter case. It's certainly in the blood testing case, the plasma case from the Seventh Circuit. The act doesn't allow for unilateral refusal to go back to work. Secondly, and this isn't really talked about in the district court, but it's certainly a ground for affirmance here. They complained about safety issues. They said the part's not safe. You're putting people at risk. They didn't suggest you are defrauding the government, not until they filed a lawsuit. So they're probably not covered because they didn't engage in protected activity. But you know, I'm not sure you're right about that because it seems to me you're skipping over the fact that the plaintiffs were concerned that the parts weren't safe and that Woodward was hiding this fact from the government. And it's not such, you know, a great leap to think that the government would want to know if the manufacturer of parts for aircraft was supplying unsafe parts and therefore failing to tell the government about safety issues in aircraft parts by definition could actually, it could constitute fraud. Well, Your Honor, certainly the government would want to know if it was unsafe. My point only is the False Claims Act is rather defined in terms of the scope of their anti-retaliation protection. And it's specifically focused on fraud. It's not a general complaint statute where if you make a complaint about something and something bad happens to you, you're covered. It's quite precise. But nonetheless, the record evidence as the district court found  because they wouldn't return to their jobs that were unrelated, by the way, to the point on the assembly where they had a complaint because they were pointing back up the line saying others are making a mistake, not us. Thank you, Your Honor. Thank you, Mr. Donato. Mr. Sack, your time has expired, but you may have your two minutes. Thank you very much. I appreciate that. Just at the outset, Mr. Donato has made a lot of statements about the record and the facts that are just not correct. I don't have the time to go through them all, but I do suggest that you look at our reply brief because he has raised a lot of issues that he raised in his brief that are just wrong and we addressed in the reply. On the knowledge issue, I want to draw to Drovner. In addition to Steve Krugler, who was a decision maker, he knew that when he deleted the x-ray inspection and did not provide us a compliant substitute, that that was a violation. This occurred during a time when Woodward's quality was a disaster as 10% of Woodward's products were being returned for defects. That's in the record. And it's not an idiosyncratic view of what their requirements provide. We provided testimony from the former head of their quality department for five years, Jeff Dieselmeier. He worked there for 18 years, five of which he was the head of their quality department. He signed the quality assurance manual revisions for years. He also led a special project that revised SP-865, which sets forth the inspection requirements at issue. His view is not idiosyncratic. We're not talking about some paid expert. In fact, he's a non-retained expert and he's also provided fact testimony. His view is not idiosyncratic. It's a question for the jury to decide. You said 10% of their products? That's right. Are you talking about this product? Their products generally. At the time that Mr. Dieselmeier took over quality in 1995, and he was quality director, he was putting out fires literally left and right. And it's in the record. It's in his testimony. It's in his expert report that Woodward's quality at that time was a disaster. 10% of its parts, generally, not just this part, 10% of its parts were being returned. Parts for a helicopter or parts for all kinds of stuff? It doesn't say, but I don't think we're talking about incidental, unimportant parts. In addition, on the knowledge issue, on April 12th, 2005, when the supervisor, Maitreyi, said to Marshall and Thurman, the parts are fine, and Marshall disagreed because she knew better. He said, I'm going to go get some people to talk to you. Who did he get? He got manufacturing engineer, Doug Hollenberger, and Hollenberger said to Marshall and Thurman, don't you know at Woodward quantity is number one and quality is number two? And what did Mr. Maitreyi say to them? He said to them, it's going to take too much time and cost too much money to fix these problems. GE wants the parts regardless of the problems, and it's the two of you against the world. That's in the record. That's knowledge of the problem. And at April 14th, at the big meeting on April 14th, Mr. DiNardo talks about what Steve Gorman thought. Mr. Gorman, when Mrs. Marshall pointed out these parts are not being x-ray inspected, they're not being inspected. You're calling them a grade A joint, but you're doing nothing to verify that. He said, well, let's do another leak test. Leak test is not an inspection. And he said, well, let's do two leak tests. He knows it's not an inspection. And during that meeting, both Mrs. Marshall and Mrs. Thurman said they do not want to be responsible for killing American soldiers. And Steve Gorman says censors leak slowly. And their supervisor said, I don't think anybody's going to be killed. They knew. They knew these parts were not inspected. Let me just have you conclude with your response to the claim that assuming a false statement was involved here. Yes. I want to speak about materiality. Sure. What are we to do with the government investigation and GE's investigation of this part? I mean, isn't that at the heart of the materiality question? I mean, if the, I understand your position about Woodward, but we're assuming the government's independent of Woodward and GE's independent of Woodward. Are we to make, give no weight to that analysis that the part, that what happened was not material to the issue? You have to look at the record. And what the record says on that issue is that the government was lied to on this very inspection issue. Agent Dysart was lied to. We've got direct evidence from him. And he also testified. If you look at his deposition testimony at page 182, he said, he was asked, I assume you would agree if Woodward was supposed to x-ray inspect the grade A joint on a regular basis, but was not, that would be something that would be of concern to you. And he answered yes. And as for GE, the record in this case shows that GE was concerned with the other issue, the grade D joint. There was an overbraze issue. The question that Mr. Donato says that Mrs. Marshall and Mrs. Thurman were messing up in their job, which just isn't true, but it involves- Are you saying that the T2 sensor was not the focus of the GE inquiry? The focus of the GE inquiry was a different part of the T2 sensor. It was the grade D joint. There's an email that was sent by Rob Johnson to Woodward, which essentially summed up GE's conclusions that everything's fine. And as he unequivocally testified, and as his email indicates, what he's talking about is the grade D joint issue, which is this overbraze issue. It's not the grade A joint issue. And it has nothing to do with whether the grade A joint is inspected or not. And in fact, later on, as part of Woodward's independent investigation after the fact, they said this overbraze issue, which he complains that Marshall was messing up, that it was inconsequential. Thank you very much. Thank you, Mr. Donato. The case is taken under advice.